UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-61376-CIV-SELTZER

CONSENT CASE

EDWARD SANTANA on behalf of himself
and all others similarly situated,

    Plaintiff,

vs.

RCSH OPERATIONS, LLC d/b/a RUTH'S
CHRIS STEAKHOUSE, a Florida corporation,

    Defendant.
_____/

MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Edward Santana brings this action against RSCH Operations, LLC d/b/a Ruth's Chris Steakhouse ("Ruth's Chris"), asserting claims under both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended. Ruth's Chris moved for summary judgment on all claims. On January 18, 2012, the Court conducted a hearing on Ruth's Chris' Motion for Summary Judgment (DE 107). At the conclusion of the hearing, the Court orally granted summary judgment on two of Santana's five claims – Count I, entitled "FLSA Minimum Wage - Invalid Tip Pool" and Count II, entitled "FLSA Minimum Wage - Unpaid Hours."[1] This opinion memorializes the Court's ruling, explaining more fully its reasons for granting

---

[1] The Court denied Ruth's Chris' Motion for Summary Judgment as to Claim III, entitled "FLSA (Retalilation)", Count IV, entitled "Sexual Harassment," and Count V, entitled "The Act [Title VII] (Retaliation)" for the reasons stated on the record during the January 18, 2012 hearing on the motion.

summary judgment on two of Santana's FLSA claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is "material" if it must be decided to resolve the substantive claim or defense to which the motion is directed; an issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913 (11th Cir. 1993).

The moving party has the burden to establish the absence of a genuine issue as to any material fact.  Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970).  Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial.  Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Adickes, 398 U.S. at 160.  To create a genuine issue of fact, however, the non-moving party must present more than just some evidence of a disputed fact.  As the United States Supreme Court has explained, "there is not an issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment must be granted."  Anderson, 477 U.S. at 249-50.  And summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof.  Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id; see also Earley v. Champion Int'l Corp., 907 F.2d 1077 (11th Cir. 1990).

## FLSA - INVALID TIP POOL

On February 1, 2010, Ruth's Chris hired Santana to work as a server in its Coral Gables restaurant; Santana worked at the restaurant for approximately 4½ months. During his employment, Ruth's Chris paid Santana an hourly wage (less that the statutory minimum amount) supplemented by a share of a tip pool.[2] Santana acknowledges that the FLSA permits the distribution of tips through a tip pooling arrangement.[3] See 29 U.S.C. § 203(m); Garcia v. La Revise Assocs. LLC, No. 08 Civ 9356(LTS)(THK), 2011 WL 135009, at *5 (S.D.N.Y. Jan. 13, 2011) ("The FLSA permits the distribution of tips through tip pooling or sharing agreements."). Santana, however, contends that Ruth's Chris was not entitled to a "tip credit" because it failed to comply with the FLSA's "tip credit" requirements. More specifically, Santana argues that Ruth's Chris' tip pool was invalid because non-qualified employees – food runners – participated in the pool and, therefore, Ruth's Chris failed to pay

---

[2] The parties dispute whether Santana's participation in the tip pool was mandatory or voluntary. Viewing the evidence in the light most favorable to Santana, as the Court must do when deciding a summary judgment motion, the Court assumed that participation was mandatory, as Santana contends.  However, to the extent that Santana may be arguing that mandatory tip pools are *per se* invalid, such argument is unavailing.  The FLSA permits mandatory tip pool arrangements.  See Kilgore v. Outback Steakhouse of Florida, Inc., 160 F.3d 294, 303 (6th Cir. 1998) (rejecting argument that all employer-required tip-outs violate the FLSA).

[3] According to Santana, the busboys ("service assistants") received 15% of the tips; the food runners received 10%; and the bartenders received 5%.  Santana Dep. at 195 (DE 42-4).

him the minimum wage in violation of the FLSA.

The FLSA generally requires that an employer pay its employees at an hourly rate equal to the statutory minimum wage. An employer, however, may offset the minimum wage of an employee (who customarily and regularly receives more than $30 per month in tips) by taking a "tip credit" against minimum wage, provided that "the employer informs the employee that the credit is being taken and where all tips received by the employee are retained by the employee." Garcia, 2011 WL 135009, at *5. "Where an employer takes the tip credit in connection with a tip pooling arrangement, the application of the credit will only be valid so long as the pool includes only those employees who 'customarily and regularly receive tips.'" Id. (quoting 29 U.S.C. § 203(m)). "In determining whether a participating employee is one who 'customarily and regularly receives tips,' courts . . . focus on whether the employee in question is 'part of an occupation that customarily and regularly receives tips' or whether they have more than 'de minimis' interaction with customers as part of their employment." Id.; see also Kilgore v. Outback Steakhouses of Florida, Inc., 160 F.3d 294, 301 (6th Cir. 1998). "Where employees' perform some duties that entail customer service and others that do not [as here], the employees' level of direct customer interaction is critical to a determination of whether the employee may participate in a mandatory tip pooling arrangement." Pedigo v. Austin Rumba, Inc., 722 F. Supp. 714, 730 (W.D. Tex. 2010).

During Santana's employment with Ruth's Chris, on any given shift, there were 2-4 food runners and 8-12 servers, depending on the needs and numbers of diners at the restaurant; the food runners were not assigned to specific servers. In support of its summary judgment motion, Ruth's Chris submitted the sworn declarations of all four food runners who worked at the Coral Gables' Ruth's Chris at the same time as Santana. See Roy Chianesse

Decl. (DE 107-10); Dady Dorsainvil Decl. (107-11); Marcus Hernandez Decl. (107-12); Alex Ortiz Decl. (DE 107-13).  According to these food runners, their duties included:  reviewing the food tickets as they would come in; tracking cooking times on all orders to ensure that food would be served timely; performing quality control and presentation of the food; garnishing entrees; placing food on trays; and delivering the service trays to the diners' tables.  See Decls. §§ 4 (DE 107-10 through 107-13); see also Ruth's Chris' Runner Position Description, Ex. F to Jones Decl. (DE 107-6).  Additionally, the food runners duties included "serving food to the guests because it [was their] job to assist the server as needed to make sure guests [had] a positive dining experience"; they served food to guests "any time a server [was] not able to immediately [do] so."  Id.   Chianesse estimated that he served food to guests 40% - 50% of the time (DE 107 ¶ 9);  Hernandez estimated that he served food to guests 40% of the time (DE 107-12, ¶ 8); and Ortiz estimated that he served food to guests 15% - 20% of the time (DE 107-13, ¶ 8).[4]

Two of Santana's managers – Bradford Herrell and John Clark – attest that "[f]ood runners at the Coral Gables restaurant are responsible for, among other things, delivering bread, salads, appetizers, and desserts to guests.  Food runners also place the entrees near the guests for a server to deliver, but occasionally deliver the entrees to guests themselves." Herrell Decl. ¶ 12 (DE 107-8); Clark Decl. ¶ 12 (DE 107-9).  Richard Goddard, a server with Ruth's Chris for 10 years, testified that the food runners served salad, appetizers, and desserts to guests and if a server was not at the table when the food trays were brought out, the food runner would also serve the entrees.  Goodard served his own entrees 90% of the

---

[4] Food Runner Dorsainvil did not estimate the percentage of the time he actually served food to guests.

time. Goddard Dep. at 20, 29 (DE 113-6). Goddard estimates that the food runners evenly split their time in the kitchen and the dining room. Id. at 20. Bradley Moore, another server with Ruth's Chris for ten years, testified that the majority of the time, the food runners would serve the salads and desserts to guests, but the servers would serve the entrees after the food runners brought them to the table. Moore Dep. at 5[5] (DE 113-8); at 40 (DE 113-9). Moore serves his food 70% or more of the time. Id. at 6 (DE 113-8). And another server, Miguel Barradas, testified that the food runners at Ruth's Chris delivered the salads and appetizers to the guests; Barradas estimates he serves the entrees 70% to 80% of the time. Barradas Dep. at 34[6] (113-4). Barradas additionally testified that the food runners had "a lot of contact with the guests all the time. Because they are serving, they interact with the guests." Id. at 37 (DE 113-4).

Santana contends that the majority of the food runners' duties – assembling food on the trays and garnishing the food – were actually those of an expediter, taking place in the kitchen out of the presence of guests. Santana Dep. at 195 (DE 42-4). His deposition testimony about the food runners' activities in the guests' presence, however, is scant and equivocal. At his November 2, 2010 deposition,[7] Santana testified that the food runners would serve salad to the guests 10% of time and that they would also serve appetizers 10% of the time. Yet, he additionally estimated that the food runners would bring unspecified

---

[5] The Moore deposition page numbers referenced are the numbers of the docket entry, not the page numbers of the deposition transcript.

[6] The Barradas deposition page numbers referenced are the numbers of the docket entry, not the page numbers of the deposition transcript.

[7] Santana also gave a second deposition on September 23, 2011; neither party, however, submitted the transcript of that deposition for the Court's consideration.

"food" to the tables and put it on a tray jack near the tables 10% of the time, but they would actually serve the food to guests only 1% of the time.  Santana Dep. at 199 (DE 42-4).

On this evidence no reasonable jury could find that food runners at Ruth's Chris had only *de minimis* interaction with customers as part of their employment.  Accordingly, Ruth's Chris is entitled to summary judgment on this claim (Count I).

## FLSA - MINIMUM WAGE - UNPAID HOURS

Count II of the Amended Complaint alleges that Ruth's Chris "on numerous occasions," "failed to pay Plaintiff any wages for hours worked."  ¶ 17 (DE 48).  More specifically, Count II alleges that Ruth's Chris failed to pay Santana for hours he worked during his orientation period and failed to pay him for hours spent for obligatory at-home study during his first week of training.  ¶ 18 (DE 48).  Count II also alleges that Ruth's Chris "had a pattern and practice on many days of clocking Plaintiff out early, while Plaintiff was still performing his duties." ¶ 19 (DE 48).

In a FLSA action for unpaid wages, the plaintiff employee bears the burden of establishing the amount and extent of his uncompensated work.  Anderson v. Mt. Clemons Pottery Co., 328 U.S. 680, 687 (1946).  To meet this burden, the employee must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. . . ."  Id. at 687-88.  Additionally, "a plaintiff must show that the employer had actual or constructive notice of the fact that the uncompensated person was working without compensation." Higgins v. Food Lion, Inc., 197 F. Supp. 2d 364, 368 (D. Md. 2002).

Ruth's Chris moved for summary judgment on Count II, arguing that Santana had failed to produce any competent evidence of the number of hours for which he allegedly was

7

not paid. It is undisputed that Ruth's Chris' employees have their own card they use to clock in and out; they clock themselves in and out at computers at the restaurant and the data recorded is then transmitted to payroll for processing. Sandra Jones Decl. ¶ 11 (DE 107-6). If an employee needs to clock in or out outside the time he is scheduled to work, a manager must assist the employee with clocking out. Id. Employees are paid for the hours recorded in the computer system. Id.

In support of its summary judgment motion, Ruth's Chris submitted payroll detail export records that reflect the hours Santana was scheduled to work, the hours he actually worked, and the hours for which he was compensated. Ex. D to Jones Dec. (DE 107-6). Ruth's Chris also submitted the detail payroll register that shows the total amount of time Santana worked, the amount of gross and net wages he earned, the amount of his tips, the types and amounts of deductions from his wages, the method of payment, and the check number. Ex. E to Jones Dec. (DE 107-6). These records reflect that on 44 days Santana did work more hours than those for which he was scheduled, that a manager clocked him out to account for the extra hours, and that he received compensation for the additional hours. See detail export records. Ex. D. and E to Jones Decl (DE 107-6).

Ruth's Chris has also submitted the declarations of all three managers who supervised Santana – Brett Boulmay, Bradford Herrell and John Clark. They all attest that they never directed Santana to work off the clock, that Santana never informed them that he had performed any work off the clock, and that they have no knowledge of any work Santana performed off the clock. Boulmay Decl. ¶¶ 6, 7, 8 (DE 107-7); Herrell ¶¶ 3, 4, 7 (DE 107-8); Clark Decl. ¶¶ 3, 4, 7 (DE 107-9). More significantly, Boulmay, Herrell, and Clark deny that they ever clocked out Santana before he had completed his work. Boulmay Decl. ¶ 8 (DE

107-7); Herrell Decl. ¶ 5 (DE 107-8); Clark Decl. ¶ 5 (DE 107-9).

Santana's minimum wage/unpaid hours claim is three-fold; he alleges that Ruth's Chris did not pay him for hours worked during orientation, that Ruth's Chris did not pay him for hours spent in obligatory at-home study, and that Ruth's Chris's managers would "clock him out" early, while he was still working. In opposing Ruth's Chris's summary judgment motion, Santana relies primarily on his November 2, 2010 deposition testimony. Santana did testify that at his (first) deposition that he was not paid for all the hours he worked in the restaurant during his first week of orientation; however, he could not recall the number of hours for which he was not paid or when he is claiming that he worked these hours. Santana Dep. at 38-39, 186-87, 204-05, 323-326 (DE 42). And Santana failed to testify at all about any obligatory home study for which he was not paid. Rather, he submitted the deposition testimony of other Ruth's Chris employees who testified that they had studied at home and had not been paid for these hours. See Daniel Gomez Dep. at 23-25 (DE 113-3); Ronda Cook Dep. at 28-31 (DE 113-5); Richard Goddard Dep. at 35-38 (DE 113-6); Bradley Moore Dep. at 17-20 (DE 113-8).[8] Such testimony of others, however, is not sufficient to demonstrate that Santana himself ever studied at home, the number of hours he studied, or that he was not paid for studying at home.

With respect to Santana's allegations as to working off the clock, Santana acknowledged that three days after he began his employment, he received a card that he

---

[8] Santana also cites to the deposition testimony of Franciso Arocha as an example of an employee who testified that he was not paid for home study. Arocha, however, testified that he never studied at home. Arocha Dep. at 42-43 (DE 113-10). The page numbers of these employees' depositions refer to the numbers of the docket entry, not the page numbers of the deposition transcript.

used to swipe to clock himself in and out of work. Santana testified that unspecified managers on un-specified dates overrode the system to clock him out while he was still working. But Santana was unable to testify as to how many times this happened or how many hours he was owed compensation due to working off the clock. Santana Dep. at 323-25. Plaintiff admitted he had no evidence that he worked more hours than he was paid because his "mental notes" did not indicate when he allegedly worked more hours. Id.

Despite having testified under oath that he had no written records or other documentary evidence as to his minimum wage/unpaid hours claim and despite his inability to recall when he worked without pay or the numbers of unpaid hours he worked, in opposition to Ruth's Chris's summary judgment motion, Santana submitted a document entitled "Unpaid Hours" (DE 113-2 at p. 42). This unverified document purports to identify the following information for each weekly period he was employed: the number of hours he was scheduled to work; the number of hours for which he was paid and the hourly rate paid for those hours; the actual hours he (allegedly) worked; the precise number of hours for which he (allegedly) was not paid; and the precise amount he (allegedly) is due for the hours he was not paid. According to this document, Santana was not paid for 75.43 hours and is owed $326.11 for the (allegedly) uncompensated hours. Santana also submitted a handwritten (unverified) document setting forth (for 14 identified dates) the time he was scheduled to work and the time he clocked in. Santana did not mention these documents in his deposition; nor did he proffer any affidavit with respect to the documents or the information contained therein. Nowhere has Santana explained how, months after his sworn deposition at which he was unable to provide any specific information as to the unpaid hours claim, he was later able to identify the precise days on which he allegedly was not paid and

the precise number of hours – let alone down to the hundredths of an hour – he claims he was uncompensated. Moreover, in his Memorandum in Opposition to Defendant's Motion for Summary Judgment (DE 113), Santana failed to discuss these documents at all; he mentioned merely that he had filed a table of unpaid wages (without citation to the record). Id. at 22. The Court, therefore, concludes that in light of Ruth's Chris' submissions, these unverified, unsubstantiated, and unexplained documents fail to create a genuine issue of material fact as to the extent Santana was not paid for hours spent in orientation, hours spent in in-home study, and hours spent working off the clock.

Finally, with respect to his minimum wage/unpaid hours claim, Santana contended that he testified at his second deposition about uncompensated time, including hours for home study both during and after training, and hours he worked off the clock because his managers clocked him out early. See Plaintiff's Statement of Material Facts in Dispute at ¶¶ 24- 26 (DE 114). Yet, Santana never submitted the transcript (or excerpts thereof) of his second deposition. The Court, therefore, could not consider this alleged testimony in determining the propriety of summary judgment on Santana's minimum wage/unpaid hours claim.

As explained above, a party opposing summary judgment must present more than just some evidence of a disputed fact. "There is not an issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment must be granted." Anderson, 477 U.S. at 249-50. Additionally, summary judgment is appropriate where the non-moving party cannot establish an essential element on which he bears the burden of proof. Celotex, 477 U.S. at 322-23. Here, the evidence properly

11

presented to the Court by Santana is not significantly probative; at best, it is merely colorable. In sum, Santana failed to meet his burden of producing "sufficient evidence to show the amount and extent of [uncompensated] work as a matter of just and reasonable inference. . . ." Mt. Clemons Pottery Co. 328 U.S. at 687-88. Accordingly, Ruth's Chris is entitled to summary judgment on Santana's minimum wage/unpaid hours claim (Count II).

DONE AND ORDERED in Fort Lauderdale, Florida, this 13th day of February 2012.

BARRY S. SELTZER
United States Magistrate Judge